IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DEDRICK V. MCDADE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. 2:16-cv-158-ECM |
| | ) | (WO) |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| TRANSPORTATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

This case is before the Court on two motions for summary judgment: one by
Defendants Alabama Department of Transportation ("ALDOT"), Kelly Brendle, and Bill
Flowers (doc. 93) and the other by Defendant Janice Duncan (doc. 95).  The Plaintiff,
Dedrick McDade, agrees that defendants Brendle, Flowers, and Duncan are entitled to
summary judgment and only challenges the Alabama Department of Transportation's
Motion as to Count Two of his Complaint.

McDade asserts that ALDOT unlawfully discriminated against him and subjected
him to a hostile work environment based on a combination of his race (black) and gender
(male), and retaliated against him in violation of Title VII of the Civil Rights Act of 1964,
as amended, 42 U.S.C. § 2000, et seq. ("Title VII").  McDade asserts that ALDOT failed
to provide him the same advancement opportunities available to others and then retaliated
against him after he complained about what he believed to be violations of employment

discrimination laws. As explained below, the State Personnel Department, an organization that has been dismissed from the lawsuit, controlled whether McDade was eligible for a competitive promotion, and ALDOT has well-documented, non-discriminatory reasons for taking the personnel and disciplinary actions that McDade alleges were discriminatory and retaliatory. Further, McDade fails to establish that he was subjected to a hostile work environment. Accordingly, the Defendants' motions are due to be granted.

## II.    JURISDICTION AND VENUE

The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1343 and the jurisdictional grant found in 42 U.S.C. § 2000e-5(f)(3). The parties do not challenge venue, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C § 1391.

## III.    PROCEDURAL BACKGROUND

McDade filed the operative complaint[1] on February 21, 2017, bringing a variety of claims against the Alabama State Personnel Department ("SPD"), ALDOT, and ALDOT employees Bill Flowers, Kelly Brendle, and Janice Duncan for alleged race, gender, and disability discrimination under a variety of federal statutes. McDade later dismissed his claims against SPD. (Docs. 81 & 82). McDade also voluntarily dismissed his disparate impact claims. (Docs. 88 & 90). After the Defendants filed their Motions for Summary Judgment, McDade moved to voluntarily dismiss his disability discrimination claims. (Docs. 102 & 106). In his response to the Defendants' Motions for Summary Judgment,

---

[1] For ease, the operative complaint, which is the Second Amended Complaint, is referenced herein simply as the "Complaint."

McDade agrees that the individual defendants Flowers, Brendle, and Duncan are entitled to summary judgment on the claims against them. (Doc. 116). McDade contests the Summary Judgment Motion only on Count Two, that ALDOT unlawfully discriminated and retaliated against him based on a combination of his race and gender in violation of Title VII.

## IV.    FACTUAL BACKGROUND[2]

### A. Alabama Merit System

As a state employee, McDade's employment is governed by a detailed statutory and regulatory scheme referred to as the Alabama State Merit System. *See* Ala. Code § 36-26-3 (1975). This system is designed to ensure that citizens have an equal opportunity to compete for employment with the State of Alabama. *See id*. The Court explores the relevant provisions of the Merit System below.

Jobs within the classified service, such as the position that McDade holds, are subject to a classification plan that describes the job class and its associated duties. *See* Ala. Code § 36-26-11(1975); (Doc. 94-1 at 3). A job class encompasses positions that are similar with respect to authority, responsibility, and the type of work required. Each job class in the classification plan must be described to have the same requirements for education, experience, capacity, knowledge, and skill demanded for proper performance of the duties of the position. Ala. Code § 36-26-11(1975). A defined pay schedule applies to

---

[2] In its reply brief, ALDOT objects to certain evidentiary submissions made by McDade in opposition to Defendants' motions for summary judgment. However, the court's consideration of McDade's challenged evidence does not alter its analysis or conclusions. Accordingly, the Defendants' objections are moot.

all classified service positions and the classification plan designates the probable lines of promotion in a job class. Ala. Code § 36-26-11(1975); (Doc. 94-1 at 3).

### a. Process for Ranking Candidates and Filling Open Positions

SPD recruits and tests for many job classifications on an ongoing basis, so SPD may announce that it is accepting applications for a job classification even when there is not a particular opening. SPD is responsible for identifying the best qualified candidate and employs professional analysts, personnel assistants, and support staff to accomplish this goal. When a state agency or department wants a job class to receive applications, SPD assigns an analyst to conduct a job analysis. The analyst creates a job announcement and a test—either a written test, a performance-based test, an oral interview, an evaluation of training and experience, or an assessment center technique—for the job class.

Once SPD receives an application, one of the division's Examination Analysts decides whether the applicant meets the announced minimum qualifications. If the applicant does not meet those qualifications, he or she is eliminated from consideration and is notified of that fact in writing. Analysts then score the minimally qualified applicants and a second analyst independently scores the applicant to verify the primary score. For the Accounting Manager job class, analysts score education, levels of experience, and certifications. (Doc. 94-4 at 3). Analysts do not award points for working titles, acting titles, or the number of employees an applicant previously supervised. (*Id*. at 5). Analysts also do not consider an applicant's disciplinary record. (Doc. 94-6 at 28).

When a state agency needs to fill a position, it requests that SPD provide a "Certificate of Eligibles," which lists the top ten candidates for the position. (Doc. 94-1 at

11).  If SPD maintains both an Open/Competitive Register and a Promotional Register for the job class, the state agency specifies from which register SPD should pull the Certificate of Eligibles.  All applicants with the same score are included on the Certificate. Accordingly, even though the Certificate is intended to be comprised of the top ten candidates, the Certificate may include many more than ten names. The state agency may select any of the candidates on the Certificate, but it may not select a candidate who is not on the Certificate.  After the agency receives a Certificate, it may select a candidate without conducting interviews. (Doc. 94-1 at 11).

While the Merit System Act and the Personnel Board rules do not address the use of a working title, employees in a classified job may have a working title used within their workplace to describe their duties.  (Docs. 94-1 at 5; 94-3 at 4).  Working titles do not impact an employee's job class, compensation, or benefits, and SPD does not directly consider working titles when scoring work experience. (Doc. 94-1 at 5).

Acting designations are also sometimes part of a working title.  Acting assignments are a temporary assignment of duties that are made to benefit the department.  Acting designations are not part of Alabama's official classification plan, and there is no formal process by which acting designations are created.  Acting designations do not have any effect on an employee's official Merit System job class, compensation, or benefits and SPD does not directly consider acting designations when scoring work experience. (Doc. 94-4 at 5).

### b.  Promotions via a Desk Audit

Employees also can seek a promotion through a process called a "desk audit." (Doc.

94-7 at 6–8). An agency must ask SPD to conduct a desk audit for an employee to initiate the reallocation process. (*Id.*). If SPD determines that the employee is performing tasks associated with a higher job classification, then SPD may reallocate the position to that higher job classification. (*Id.*). The agency may then request that SPD assign the employee who had been working in the reallocated position to that higher job classification if the employee had been working in the position for the requisite time period and is on the Promotional Register. (*Id.*). The employee must meet the minimum qualifications for the position but does not have to be listed on the Certificate of Eligibles in order to receive the promotion. The employee may assume the permanent position without serving in a probationary period or completing a working test. If the employee's salary in the prior job classification falls within the salary range for the new job classification, the employee will not receive a raise upon promotion. (*Id.*). If the employee's salary is below the new salary range, then the employee will receive the pay available at step one of the new job classification's pay grade range. (*Id.*). While a pay increase is not automatic, the employee will be placed into the pay grade of the new job position which has a higher salary available at the maximum pay grade in the range. (*Id.*)

Accordingly, McDade argues that acting designations are an important part of the promotional process.

### c. Accounting Degree Requirement

In 2007, SPD updated the minimum qualifications for the accounting classification series and made a bachelor's degree in accounting a minimum qualification. This rule did not apply to those employees already working in an accounting position in the classified

series. (Doc. 94-1 at 9–10). Thus, to be placed on the Open/Competitive Register for Accounting Manager, an applicant must have a bachelor's degree in accounting in addition to meeting the experience requirements. (*Id.*). To be placed on the Promotional Register, an applicant must have a current permanent status as a Senior Accountant within the Merit System to be excused from the degree requirements. (*Id.*). Accordingly, McDade, who does not have a bachelor's in accounting but was a Senior Accountant, met the minimum qualifications for the Promotional Register, but not the minimum qualifications for the Open/Competitive Register.

**B. McDade's Initial Appointment and Promotion**

McDade first came to perform work as an accountant at ALDOT through a temporary agency in 2001. He started working in the Fiscal Section of ALDOT's Bureau of Finance and Audits and still works in that department today. In November of 2003, McDade applied to the State Personnel Department for employment as a Staff Accountant. Bill Flowers and other employees interviewed McDade and then hired him as a Staff Accountant in July 2004. At the end of his probationary period, Bill Flowers and McDade's direct supervisor, Carolyn Rhodes, approved offering McDade a permanent status in the position and a raise.

In May 2010, McDade applied to SPD for employment as a Senior Accountant. In August 2010, ALDOT appointed McDade to a position in the Senior Accountant job class. McDade credits Bill Flowers, the former assistant Bureau Chief and Mr. Lamar McDavid,

the former Bureau Chief,[3] with his promotion. McDade's job class remains Senior Accountant.

### C. McDade's Allegations Regarding ALDOT's Discrimination

This case arises out of the allegation that ALDOT discriminated and then retaliated against McDade based on a combination of his race and gender. Specifically, McDade, who is employed by ALDOT as a Senior Accountant, alleges that he has been repeatedly passed over for advancement despite years of positive reviews. McDade contends that on multiple occasions from 2013 to 2015 he applied for or inquired about a promotion only to be told that no positions were available, even though promotions were ultimately awarded to individuals who were not part of his protected class – black male. McDade complained about this and other actions that he believed to be discriminatory and alleges that ALDOT retaliated in a variety of ways, including stripping him of certain personnel responsibilities, thwarting his promotional opportunities, and administering discipline that reduced his annual pay increase. McDade appears to believe the primary incident that prompted retaliation was his participation in the demotion investigation and hearing for his former supervisor, Janice Duncan, in 2013.

McDade asserts that Ms. Duncan, his former supervisor, began taking discriminatory actions against him beginning in 2010. Among other actions McDade alleges were discriminatory, McDade claims that Ms. Duncan related to him that another employee called him a faggot, and that she told him other employees did not like him

---

[3] Mr. Flowers became the Bureau Chief when Mr. McDavid retired. (Doc. 94-8 at 12).

because of the way he walks and talks. McDade asserts that he complained to Kelly Brendle, who was then the Deputy Director of Administration of Finance & Audits and to Bill Flowers, who was then the Director of ALDOT's Bureau of Finance & Audits, regarding some of this behavior. Ms. Duncan was eventually demoted in 2013, but McDade asserts that his complaints about Ms. Duncan's behavior in years prior were unsuccessful. During the internal investigation into Duncan's behavior, McDade alleges that he informed the investigator that he had long ago complained to Ms. Brendle and Mr. Flowers and testified to the same during Ms. Duncan's demotion hearing. He appears to rely upon Ms. Duncan's actions as support for his hostile work environment allegation, but primarily asserts that his complaints during this time led to discriminatory and retaliatory conduct from others, particularly Mr. Flowers and Ms. Brendle.

McDade asserts that ALDOT thwarted his career aspirations due to his participation in the internal investigation. He claims that ALDOT repeatedly violated its own standard procedures to avoid considering him for a promotion and refused to provide him the same opportunities as other employees to advance his career. McDade asserts that in response to his complaints of discrimination, ALDOT administered discriminatory discipline and attempted to create a hostile work environment.

### D. McDade's Applications for Promotion.

McDade has submitted five applications to the SPD for the Accounting Manager job class. Because McDade does not have a bachelor's degree with an accounting major (he was a finance major), he does not meet the minimum qualifications for the Open/Competitive Register for the Accounting Manager job class. He is eligible, however,

through the Promotional Register. The supervisors filling a position can request either the Promotional Register or the Open/Competitive Register, so McDade cannot be considered when supervisors request the Open/Competitive Register. While McDade ranked high enough to be eligible for promotional consideration at different times, he does not dispute that he was never listed as an eligible candidate when an ALDOT supervisor requested a Certificate of Eligibles to fill a position. (Doc. 116 at 19).

However, McDade claims that ALDOT regularly created openings or new positions for female employees seeking a promotion. Specifically, he claims that Tiffany Patton, a white female, was promoted through a reallocation from a desk audit. He also points to Shirley Mays, a black female, as receiving a promotion through a desk reallocation audit. McDade also claims that Carissa Adams, a white female, was hired to the Accounting Manager position that he sought when Ms. Brendle and Mr. Flowers told him that the position did not exist and was not available to him. He suggests ALDOT supervisors intentionally manipulated the availability of the position to avoid considering him for a promotion.

### E. Allegedly Retaliatory Discipline

McDade filed three different Charges of Discrimination with the EEOC on October 20, 2014, June 26, 2015, and October 19, 2015. He also used internal processes to make complaints, including submitting a grievance to Mr. Flowers in April of 2015. He alleges that these actions, along with his participation in the internal investigation of Ms. Duncan in 2013 led to retaliation from supervisors.

Specifically, McDade alleges that Brandy Brendle berated him in front of Tammy

Dunn and Carissa Adams in July of 2015, wrongly accusing him of not being cooperative with his managers. Mr. Flowers issued a formal written warning that same month for McDade being too verbose and failing to communicate in a timely manner. Mr. Flowers stated in the warning that McDade's failure to timely respond in a clear manner resulted in delayed payment to a contractor and noted that McDade had repeatedly been counseled about communicating clearly and concisely.

On September 30, 2015, Ms. Brendle issued a disciplinary write-up which McDade characterizes as wrongfully accusing him of being insubordinate. He states that a white female took nearly identical action and received no written or verbal discipline or counseling. McDade argues that this write-up meant that he was no longer eligible to receive his full annual raise and the discipline hindered his score on the Accounting Manager Promotional Register.

## V.     LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed.R.Civ.P. 56). The movant can meet this burden by presenting evidence demonstrating

there is no dispute of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id*. at 322–23. Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 249 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (*citing Anderson*, 477 U.S. at 248).

Once the movant has satisfied this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Non-movants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[ ], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the non-movant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. However, "mere conclusions and unsupported factual

allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 249–50).

A reviewing court is constrained during summary judgment proceedings from making the sort of determinations ordinarily reserved for the finder of fact at a trial. *See Strickland v. Norfolk Southern Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citations and quotations omitted) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a).

## VI.  DISCUSSION

### A. The Defendants are entitled to Summary Judgment on the claims that McDade expressly disavowed.

When plaintiffs expressly disavow claims in their response to a motion for summary judgment, courts may consider those claims abandoned and grant summary judgment to the defendants. *See Ekokotu v. Fed. Express Corp.*, 523 F. App'x. 629, 632 (11th Cir.

2013)[4] (stating that the district court correctly held that the plaintiff abandoned certain claims where he "explicitly and unequivocally disavowed them" in his response to the defendant's motion for summary judgment)(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir.1995)). McDade explicitly conceded that the individual Defendants, Brendle, Flowers, and Duncan, should prevail on summary judgment, and specified that he only intends to pursue his Title VII claims against ALDOT. Accordingly, the Defendants are entitled to summary judgment on all but McDade's Title VII claims against ALDOT.

## B. Introduction to Contested Claims

McDade acknowledges that ALDOT was somewhat limited in its ability to promote him due to the substantial role that SPD played in the hiring process. Essentially, McDade complains that ALDOT inappropriately manipulated the process by eliminating positions that McDade sought and making positions for employees who were not members of his protected class. He also asserts that he was denied an acting title, which he claims would have been beneficial because he could have then been eligible for a promotion through a desk audit.[5] He asserts that after he filed formal EEOC complaints, various managers

---

[4] The Court observes that this is an unpublished opinion and cites it only for its persuasive value. 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[5] ALDOT argues that the Court should not consider McDade's claims related to a desk audit because McDade did not sufficiently plead such a claim. The Complaint is clear that McDade is bringing claims for failure to promote. The record reflects that there is more than one avenue for a promotion, including a reallocation through a desk audit. The Complaint includes many allegations and points to comparators that support McDade's claims related to a desk audit, and the Court is not persuaded that reallocation is wholly distinct from a promotion, as ALDOT suggests. Accordingly, the Court will consider McDade's claims related to failure to promote via a desk audit.

retaliated by issuing unwarranted discipline, some of which had direct career implications.

ALDOT asserts that SPD was responsible for maintaining the promotional registers, that ALDOT had legitimate, non-discriminatory reasons for each of the employment actions McDade characterizes as adverse actions, and that McDade cannot establish a *prima facie* case for hostile work environment because he cites only isolated incidents of purportedly offensive conduct. The Court addresses each of these arguments.

### C. McDade fails to sufficiently support his failure to promote claims.

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013). Plaintiffs bear the burden of establishing a *prima facie* case of discrimination in Title VII cases that are supported by circumstantial evidence. *Brown v. Ala. Dep't. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (citing *Wilson v. B/E Aerospace Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)). A failure to promote claim requires a plaintiff to demonstrate that (1) the plaintiff belongs to a protected class; (2) the plaintiff applied for and was qualified for the promotion; (3) the plaintiff was rejected despite his qualifications; and (4) other equally or less qualified employees outside his class were promoted. *Id*. (citing *Wilson*, 376 F.3d at 1089). The comparators for the fourth prong must be "similarly situated in all material respects." *Lewis v. City of Union City, Georgia,* 918 F.3d 1213, 1224 (11th Cir. 2019). The burden is not on the defendant to disprove discrimination, but the burden remains on plaintiffs to provide sufficient support that discrimination occurred. *Id*. at 1223.

If the plaintiff makes the requisite showing, the burden shifts to the employer to articulate legitimate, nondiscriminatory reasons for its actions. *Brown*, 597 F.3d at 1174 (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)). The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). Instead, the employer rebuts the presumption of discrimination by articulating a non-discriminatory reason for the employment action, and the burden then shifts back to the plaintiff to show that the alleged reason is simply a pretext for discrimination. *Id.* (citing *Wilson*, 376 F.3d at 1087).

### a. The assignment of supervisory duties to Ms. Dunn, when she did not receive a promotion, does not qualify as an actionable failure to promote claim.

In 2013, Janice Duncan was demoted from the Accounting Manager of the Fiscal Section, and ALDOT assigned her duties to Tammy Dunn, who was already an Accounting Manager supervising the Cost Section. Accordingly, Ms. Dunn assumed additional responsibilities for the Fiscal Section, but was not promoted. McDade argues that he was already doing the work for the Fiscal Section and was better acquainted with the processes in the Fiscal Section than Ms. Dunn. (Doc. 94-9 at 162). He argues that her experience as an Accounting Manager for the Cost Section did not make her more qualified than he was for the Accounting Manager position over the Fiscal Section.

McDade, however, cannot complain of a failure to promote when no employee was promoted. *See Brown*, 597 F.3d at 1179. "In a failure-to-promote case, the plaintiff must show that other employees of similar qualifications who were not members of the protected class *were indeed promoted* at the time the plaintiff's request for promotion was denied."

*Id.* (emphasis in original) (internal quotations and alterations omitted). Where the employee who assumed the desired job "retained the same job classification and received no pay increase," there is "no promotion." *Id.* McDade fails to cite any evidence to contradict ALDOT's assertion that Ms. Dunn remained an Accounting Manager and was not promoted to a different job class. (Doc. 94-8 at 5). McDade similarly does not attempt to argue that Ms. Dunn received a pay increase. Accordingly, McDade failed to prove his *prima facie* case that another employee was indeed promoted in this instance.

### b. McDade fails to provide evidence to demonstrate that he met ALDOT's minimum qualifications when ALDOT promoted Carissa Adams to Accounting Manager in February 2015.

McDade also fails to provide sufficient evidence regarding Carissa Adams's promotion in 2015. The record is undisputed that McDade was not on the Certificate of Eligibles that SPD maintains when Ms. Adams was promoted. Accordingly, ALDOT could not consider McDade for the promotion. McDade argues that "ALDOT had manipulated the vacancy since Duncan's demotion to keep McDade from getting that job." (Doc. 116 at 53). McDade does not further explain this argument, nor does he explain precisely how ALDOT manipulated the vacancy to prevent McDade from receiving that promotion.

McDade is "required to satisfy the Department's objective criteria and there [is] no evidence that the use of this particular Certificate was invalid or otherwise improper. [McDade] thus fail[s] to show that [he] was qualified for the promotion given to [Adams]." *Brown*, 597 F.3d at 1180. While McDade suggests that ALDOT manipulated the timing of the job openings to avoid considering him for the position, he fails to provide specific

support for this allegation. General allegations that the timing of the job openings is suspicious is not enough to demonstrate that the use of the Certificate of Eligibles was improper. Accordingly, McDade failed to show he was minimally qualified for the Accounting Manager job when Ms. Adams was promoted because he was not listed on the Certificate of Eligibles.

McDade also does not provide any evidentiary support to rebut the non-discriminatory reasons that ALDOT set forth to justify its hiring of Ms. Adams. Ms. Brendle testified in her deposition that she considered Ms. Adams more qualified because she had a great deal of accounting knowledge and research abilities. (Doc. 94-5 at 72). Ms. Brendle further explained that Ms. Adams was able to problem solve better than McDade. (*Id*.). As an example of McDade's inability to sufficiently problem solve, Ms. Brendle stated that he was tasked with completing journal entries but had to do them several times. (*Id*.). She also stated that in the past, she asked him for information, and he submitted the requested information, only to have him later say that the information he provided was incorrect. (*Id*.). She further stated that when McDade was asked to complete a task, he would "argue about how it is done or how he did it before or just wanting to challenge everything instead of getting the job done." (*Id*.). Ultimately McDade's lack of relationship skills and his continued conflict with a variety of people, including subordinates and supervisors, led Ms. Brendle to conclude that he was not a suitable candidate for a manager position. (*Id*. at 51–53).

A review of Ms. Adams's resume reveals that, consistent with Ms. Brendle's assertion, she was better qualified than McDade. Ms. Adams was also a Senior Accountant

in the Finance Department of ALDOT and had held that position since September 2010. (Doc. 94-3 at 41). She had previously worked as a Senior Accountant in two different departments of the Public Health Department for approximately three years and had experience creating and monitoring multi-million-dollar budgets. (*Id*. at 42). Accordingly, she had more experience as a Senior Accountant than McDade when she was promoted. Thus, McDade fails to meet his *prima facie* burden and otherwise fails to rebut ALDOT's proffered non-discriminatory reasons for promoting Ms. Adams.

### c. McDade does not provide sufficient evidentiary support for his allegation of discriminatory failure to promote due to the lack of support for a desk audit and the denial of acting designation.

McDade sought an "acting" designation but claims that he was denied this title because he is a black man. ALDOT argues that acting designations do not have any effect on an employee's official Merit System job class, compensation, or benefits. (Doc. 94-1 at 5). The SPD analysts scoring applications do not consider the acting designation title when scoring work experience. (Doc. 94-1 at 5–6). Promotions involve changes in official Merit System job classifications and acting designations do not. (94-1 at 4).

McDade apparently believes that an acting designation is often a first step towards obtaining a promotion. As evidence, he offers the deposition testimony from Ms. Brendle that in 1999, ALDOT placed her in an acting supervisory role and she obtained that permanent promotion without additional competition from other candidates. (Doc. 116 citing doc. 94-5 at 22). He further alleges that after he had been in the acting position for only a few months, he could have requested a desk audit and likely would have received a promotion under the reallocation rule. Under that rule, McDade asserts that he could have

circumvented the normal promotional requirements that he be in the top ten candidates and would have been promoted if his number was in the upper half of the Promotional Register.

McDade also points to Tiffany Patton (white female) and Shirley Mays (black female) as comparators who received promotions through reallocation from a desk audit. (Doc. 116 at 20). In his response brief, McDade does not cite any evidence regarding their education, experience, or background. McDade similarly fails to cite evidence regarding the needs of the organization when these women were promoted or how long they had taken on work beyond their job description before they were promoted. In short, McDade fails to establish that Patton and Mays are valid comparators.

McDade also vaguely complains about Ms. Dunn's promotion to Accounting Director I. ALDOT explains that it "views the Second Amended Complaint as discussing Dunn's promotional appointment to Accounting Director I to provide an anecdotal example of a person McDade believed received a promotion because of an 'acting' designation" after she was given the responsibilities for supervising the Fiscal Section. (Doc. 104 at 62). McDade does not appear to disagree with ALDOT's characterization of his claim. While McDade includes some information regarding Ms. Dunn's promotion in the Complaint, he largely fails to develop this theory in his response brief. He briefly mentions Dunn's promotion, but again does not include details regarding her new position, or other information regarding the circumstances of her promotion. Without these important details, McDade cannot effectively argue that due to his status as a black male, these purported comparators received more favorable treatment than he did.

**D. McDade fails to provide sufficient evidentiary support for his claim that ALDOT's personnel or disciplinary decisions were retaliatory.**

The anti-retaliation provision is broader in scope than the discrimination provisions of Title VII. Plaintiffs may succeed on their retaliation claims even when their underlying discrimination claims fail. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

To establish a claim for retaliation under Title VII, an employee must prove that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) some causal link between the two events. *Bryant v. Jones,* 575 F.3d 1281, 1308 (11th Cir. 2009). Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse action. *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). If the defendant proffers a legitimate non-retaliatory reason for its action, then the burden shifts back to the plaintiff to show that the reason is merely pretextual and that the real reason was retaliatory. *Id*. A plaintiff cannot merely point to facts that show retaliatory animus, and instead, must rebut each of the defendant's explanations. *Id*. The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided is pretext for retaliatory conduct. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). To meet this burden the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, in-coherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (quoting

*Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)).

Under Title VII, a plaintiff must also demonstrate that the retaliation was a "but-for" cause of the adverse action and that the adverse action would not have occurred absent wrongful actions of the employer. *Univ. of Tex. SW. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). Adverse actions are those that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57.

### a. McDade does not provide sufficient evidentiary support for his claim that ALDOT's failure promote him after Ms. Duncan's demotion was retaliatory.

McDade apparently claims that assigning Ms. Dunn the supervisory duties for the Fiscal Section instead of granting him the promotion was retaliatory. As explained above, McDade does not have a claim for discriminatory failure to promote because Ms. Dunn was not awarded a promotion, she merely assumed additional duties. ALDOT provided a legitimate explanation for the choice of assigning additional duties to another Accounting Manager, rather than promote McDade, when there was not a position available at the time. ALDOT similarly provided legitimate, non-discriminatory support for its decision to later promote Ms. Adams. McDade fails to rebut these reasons by citing such inconsistencies or incoherencies that a reasonable factfinder could find those reasons unworthy of credence. Thus, his retaliation claims for failure to promote fail.

### b. The verbal counseling was not sufficiently adverse to be considered retaliatory.

In June 2015, Ms. Brendle engaged in a counseling conversation with McDade that

lasted only a few minutes. During this conversation, she explained that she felt that McDade was not being cooperative with his supervisors. In particular, he had emailed his supervisor, Ms. Adams, asking if he should be in a meeting after he observed Ms. Adams and other supervisors sitting in a conference room. This meeting did not involve McDade or his work. Ms. Brendle explained in her deposition that she felt like this email was not prompted by a genuine concern that he was absent from a meeting that required his presence, but that he was attempting to provoke his supervisor and complain about not being included, a problem that she felt was ongoing. (Doc. 94-5 at 135). Accordingly, in a conversation that included Ms. Adams and Ms. Dunn, Ms. Brendle told McDade that he needed to try to be respectful to Ms. Adams and have a cooperative attitude. She did not allow him to respond during this brief counseling. McDade testified that he felt humiliated by this counseling and then submitted a 15-page response to Ms. Brendle.

The June verbal counseling from Ms. Brendle fails to meet two important elements of retaliation: the counseling did not constitute an adverse action; and it was not related to any protected activity. The subject counseling was only a conversation—there was no decrease in compensation or responsibilities, and there was not even a note of this conversation in McDade's employment record. While a reasonable employee may not enjoy criticism, this counseling session falls far short of qualifying as an adverse action. This brief counseling conversation is instead more like the "trivial harms, petty slights, or minor annoyances," that do not qualify as an adverse action. *See Burlington*, 548 U.S at 67–68 (concluding that conduct is adverse when it involves significant harm that might dissuade a reasonable worker from complaining of discriminatory workplace conduct).

Moreover, this conversation took place 8 months after McDade's initial EEOC complaint and before his second EEOC complaint. "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citing *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (holding that a "three to four month disparity" between the protected conduct and the adverse employment action is too long to establish temporal proximity).[6] In sum, McDade fails to meet his burden of demonstrating a *prima facie* case of retaliatory conduct as to this verbal counseling because this verbal counseling does not qualify as an adverse employment action and because McDade fails to establish the requisite causal connection. Even if McDade could demonstrate a *prima facie* case, he cannot establish pretext.

### c. **Mr. Flowers' written warning did constitute an adverse employment action.**

McDade filed an amended EEOC complaint in July of 2015 and shortly thereafter, he received a warning from Mr. Flowers. The warning notice is clear that it is only a "preliminary discipline action and does not result in a penalty." (Doc. 94-8). Courts consider the entire context when evaluating whether an employment decision meets the adverse action standard under the retaliation provisions. *Burlington*, 548 U.S. at 64 ("the significance of any given act of retaliation will often depend upon the particular

---

[6] To the extent McDade attempts to tie Ms. Brendle's verbal reprimand to his April interdepartmental grievances against Ms. Dunn and Ms. Adams, he fails to cite evidentiary support that would suggest Ms. Brendle was even aware of these grievances. Thus, he fails to demonstrate the verbal counseling was related to his grievances.

circumstances. Context matters.").  On several occasions, the Eleventh Circuit has found that a reprimand that did not result in any tangible effect on the plaintiff's employment was not enough to constitute an adverse employment action. *See Rayner v. VA*, 684 F. App'x. 911, 915 (11th Cir. 2017) (finding that the plaintiff could not establish retaliation where the she failed to "point to any evidence that her pay or promotion prospects were negatively affected by the admonishment or the reprimand"); *Barnett v. Athens Reg'l Med. Ctr, Inc.*, 550 F. App'x. 711, 715 (11th Cir. 2013) (finding that "neither the reprimands, the negative evaluation, nor the denial of Barnett's vacation request were adverse employment actions"); *Hall v. Dekalb Cnty. Gov't.*, 503 F. App'x. 781, 785 (11th Cir. 2013) (finding that a counseling letter did not qualify as retaliation because it "did not result in a reduction in salary, work hours, or responsibilities").[7]

Moreover, the record reflects that Flowers issued this warning after another office reached out to Flowers regarding a series of emails that took place between McDade and Mr. Welch.  Mr. Welch complained that there "continues to be a disjoint between your office and mine" and that his office "is not an accounting office but continues to be asked to do accounting functions."  (Doc. 94-8).  McDade attempts to assert that Mr. Welch "did not indicate a complaint against McDade," but a disjoint with the office generally. (Doc. 116 at 55).  However, Mr. Welch forwarded an email chain between himself and McDade. (Doc. 94-8 at 38).  While Mr. Welch may have had a broader concern about the relationship between the two offices, his immediate concern obviously related to his interaction with

---

[7] *See*, n.4, *supra*.

McDade.  Flowers also reviewed the emails himself and appeared to highlight the portions that concerned him, including emails where McDade appears to contradict himself. (*Id*. at 38–42).   The email thread that Flowers received indicated that McDade first began emailing with Mr. Welch on June 17, 2015, and the pair was still attempting to address the issue at the end of July.  Flowers attached two previous admonishments, that McDade be clear and concise in his communications, to his reprimand.

It is clear that McDade received the warning after he failed to remedy ongoing communication problems.  Accordingly, the warning alone is not an adverse employment action, and McDade fails to establish a *prima facie* case of retaliation.  Even if McDade could demonstrate a *prima facie* case, he cannot establish pretext.

### d.  McDade's discipline from Ms. Brendle that resulted in a reduction in his yearly pay-raise was well-supported.

In September of 2015, Ms. Brendle issued McDade a written reprimand for being insubordinate.  This discipline meant that McDade would receive a lower score on his yearly evaluation and would not be eligible to receive the maximum raise amount.  The September 2015 written reprimand, however, was not a retaliatory employment action because there was no causal connection between it and any protected activity.  The evidence shows  that the reprimand was prompted by a complaint from a disinterested party who reported continued problems with McDade, and McDade cites no support that indicates that the individual complaining had any knowledge of McDade's ongoing complaints.

Specifically, the Comptroller for the State of Alabama, Eric White, contacted Ms.

Brendle and complained that McDade had called two different staff members in his office to ask the same question within a ten-minute period. Mr. White further stated that he had personally answered that same question the prior week and that his office was "consistently spending an inordinate amount of time with Dedrick [McDade]." (Doc. 94-3 at 87). Mr. White stated that McDade admitted to staff members that McDade had already discussed the matter with Ms. Brendle and that McDade indicated that Ms. Brendle had told him not to bother Mr. White's office. Ms. Brendle confirmed that she told McDade not to bother the Comptroller's office over a minor issue when the office was busy trying to close out the fiscal year while under the additional pressure of launching a new accounting software system. (Doc. 94-3 at 16–17).

In short, McDade engaged in unnecessarily disruptive behavior at work after having been instructed not to do so. McDade complains that Ms. Patton (white female) was permitted to contact the Comptroller's office but was not similarly disciplined. However, there is no evidence that Ms. Patton was instructed not to contact the Comptroller's office or that she disturbed her supervisor and several members of the Comptroller's office when she contacted the office. McDade failed to follow his supervisor's instructions and disrupted multiple people in the Comptroller's Office, while Ms. Patton was apparently following instructions given to her. Further, Mr. White indicated this was not an isolated incident but was an ongoing problem with McDade. Accordingly, McDade cannot demonstrate his discipline was motivated by retaliation or that he and Ms. Patton were similarly situated. Accordingly, McDade's retaliation claims fail.

### E. McDade fails to provide sufficient evidentiary support for his claim that he was subject to a hostile work environment.

To establish a hostile work environment claim under Title VII, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1195 (11th Cir. 2016) (quoting *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012)). "As opposed to discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire, a hostile work environment claim addresses acts 'different in kind' whose very nature involves repeated conduct, such a discriminatory intimidation, ridicule, and insult." *McCann v. Tillman*, 526 F.3d at 1378 (internal quotations and citations omitted). "Thus, these 'claims are based on the cumulative effect of individual acts.'" *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).

To prove a *prima facie* case of hostile work environment, a Title VII plaintiff must establish that (1) he belonged to a protected group; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment; and (5) a basis exists for holding the employer liable. *Trask*, 822 F.3d at 1195 (citing *Gupta v. Fla. Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000)).

Determining whether harassment was sufficiently severe or pervasive involves "both an objective and a subjective component." *McCann*, 526 F.3d at 1378. To determine

the objective standard, a court considers "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal citations and quotations omitted).

McDade devotes only four sentences in his response brief to his hostile work environment claim, barely setting forth the legal standard. McDade cites the disappearance of the Accounting Manager position after Ms. Duncan was demoted and the "ongoing denial of job upgrades, promotions, and 'acting positions'" as evidence of a hostile work environment. (Doc. 116 at 58). He also claims that the combination of the "discipline imposed in 2015, the name calling, the jokes about the way he walks and talks, and the ever-shrinking number of people he is allowed to supervise . . ." rendered his work environment sufficiently hostile to alter the conditions of his employment and created an abusive work environment. (Doc. 116 at 58–59).

As explained above, discrete employment actions, like failure to hire or promote, do not alone give rise to an actionable hostile work environment claim. McDade fails to adequately weave the discrete employment actions together such that, viewed collectively, they establish a hostile work environment. While McDade claims that he suffered jokes about the way he walks and talks, these complaints fall far short of establishing severe or pervasive harassment. He complains that a coworker made a single comment about his being excused from moving boxes due his protected class. McDade further asserts that Ms. Duncan, a black female made offensive comments about him sometime between 2010 and 2013. However, the record reflects that many people outside of McDade's protected

category who were supervised by Ms. Duncan had conflicts with her. McDade fails to demonstrate that his mistreatment by Ms. Duncan was causally related to his status as a black male. Additionally, while McDade alleges additional offensive comments were made, such sporadic and isolated use of derogatory language alone is not enough to establish severe or pervasive harassment. *See McCann*, 526 F.3d at 1379.

In short, McDade relies largely upon isolated incidents of offensive comments to support his hostile work environment claims. McDade fails to establish the Ms. Duncan's offensive comments were made due to McDade's protect status and were sufficiently severe or pervasive to alter the terms and conditions of his employment. Accordingly, McDade's claims for hostile work environment also fail.

## VII.   CONCLUSION

For the reasons stated above, it is

ORDERED that the Defendants ALDOT, Bill Flowers, and Kelly Brendle's Motion for Summary Judgment (doc. 93) and Janice Duncan's Motion for Summary Judgment (doc. 95) are GRANTED, and this case is DISMISSED with prejudice. It is further

ORDERED that costs of this proceeding are taxed against the Plaintiff for which execution may issue.

A separate final judgment will be entered in accordance with this order.

Done this the 24th day of January, 2020

_____ /s/ Emily C. Marks _____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE
